Our last case today is 411-0749. We're in marriage of Berberet or Berberet? I think they pronounce it Berberet. Sangamon County. Well, Athens, Athens. Yes, okay. So parents of Ms. Ryan for the appellant, parents of Ms. Sherry for the appellee. Counsel, before we begin, I want to observe that we ask people to be here a half hour ahead of time. And one of the reasons is in the unlikely event that we can actually go a half hour ahead of time. This is the second time today. I want to thank you both for adhering to our request and going along with it. Because here we are, we can get started early and get better. So with that, you may proceed. Thank you. And may it please the court. Counsel. I represent the petitioner appellant, Rebecca Berberet, who I'll refer to as Rebecca, consistent with our brief. The trial court in this case deviated downward in setting child support to be paid my client by Mr. Berberet. And it deviated downward by 30%. We believe that that decision was an error. The parties have three children. They're now ages 16, 12, and 9. They're busy, active, involved children. My client has residential custody of them. The court in its decision set child support at $1,000 a month rather than the statutory amount of $1,433 a month. During the two-year temporary period in this case, the temporary order had Mr. Berberet paying $1,290 a month. So the trial court dropped the child support responsibility to Mr. Berberet by $290 a month over the temporary relief order in this case. It breaks down to about 22% of his net income for three children. Under the case law in Illinois, there has to be compelling reasons to deviate downward in establishing child support. And we believe that in this case, there were absolutely no compelling reasons to justify a deviation downward in child support. Marriage of Stanley, which is a case this court decided back in 1996, listed some exceptional circumstances compelling enough to deviate downward from statutory guideline child support. And one of those reasons was that the non-custodial parent's resources were very limited. Well, in this case, Mr. Berberet had a very good job, made in excess of $80,000 a year. He also had a $240,000 non-marital liquid brokerage. So a suggestion that his resources were very limited simply was not the case in this particular situation. Another provision that the Stanley case addressed was if statutory support would be a windfall for the custodial parent. In this case, my client's expenses as set forth in her financial affidavit demonstrated that certainly statutory child support would not create any kind of a windfall for the custodial parent. In fact, even with statutory child support, she was not meeting all of her expenses. And with the deviation downward in child support, she was, I think, $700 a month under her stated expenses in her financial affidavit. The trial court in its decision acknowledged that my client would be paying most of the children's expenses, including their extracurricular expenses, but still did a calculation and said that this was a case that warranted a downward deviation in child support. The statement that the court made was that it was mindful that the children primarily resided with Rebecca, and that she is therefore going to provide for most of their needs, including their extracurricular activities. There was nothing in the record. It was a pretty substantial record in terms of the parties' separation, because it was a two-year separation. There was nothing to support the trial court's conclusion. She makes more money than he does, doesn't she? Their gross income is roughly $6,000 apart. She made about $88,000 a year. He made about $82,000 a year. So their gross incomes were similar. Now, in terms of their net income, there was a bit of a disparity there, in part because he is a police officer, and his deduction for his retirement was greater than her deduction for her Social Security. That made a little bit of a difference on the swing. In terms of health insurance, he provided health insurance for the children, and had more of a deduction than she did in health insurance. But it was not a huge swing in terms of their gross incomes at all, and in their net incomes. I think it broke down to about a $500, $600 a month difference in their net incomes. Let me ask you to address my concern about this. I need to preface it, I think, this way. I've been on this court now a long time. It's hard to believe this is my 24th year. Congratulations. Well, thank you. In that time, we have lots of marital cases. This is our third today. And I mention that because it must be hundreds, maybe even four figures of marital cases. I don't recall seeing a more comprehensive or better written trial court memorandum than what Judge Narduli wrote in this case. It bespeaks to me of great thought, insight, care by the trial judge. On a matter that is addressed to the court's discretion, we are a real deferential court normally. The three of us have over 40 years of trial court experience before we got to the appellate court. And I look at something like this and I think, how in the world am I going to conclude that this is an unreasonable, which is essentially what you have to argue, an unreasonable application of the law to the facts in this case when I'm just really impressed with the thoughtfulness of what Judge Narduli in his seven-page, single-spaced memorandum opinion has provided us? Well, let me go through this in a bit of detail.  And in terms of Judge Narduli's rulings, I'm very familiar with them because I practice in front of him constantly. And I've probably seen a hundred of his decisions. And he does write detailed decisions. And that's certainly to his, he should be commended for doing that. And unless he is far different than I was as a trial judge, this is all in his own time because you don't have time between 9 and 5 sitting in the courthouse to be doing it. Yeah, and I think he's one of the quicker in churning them out and being able to do them in large part because he was a family practitioner before he ascended to the bench. And he's been on a while. And he can certainly churn out decisions quickly, which is good. And we all appreciate that. In terms of the deviation downward, the legislature set 32 percent of net income for three children for good reason because it believed that that's what it should be. And there's case law that says you've got to give us compelling reasons why you should deviate downward in setting child support below the 32 percent figure. I don't believe there were any compelling circumstances. And he did not, Judge Narduli did not in his decision address the fact that he had a $241,000 non-marital brokerage account. My client didn't have any non-marital assets. You mean in his seven and a half page decision he left that out? There's no mention of his awareness of all this? Well, what he did is he, in his calculation of child support, the reason that he said statutory child support was not $1,290 a month, which is what the judge in the temporary order set it on, and rather said it was $1,433 a month, is he attributed I believe it was $3,800 in income from that brokerage account on an annual basis and added that to the income in calculating child support. And then he also added from another job this gentleman worked, he added that on too in terms of calculating what the child support was. So that was a mention. But in terms of going through his decision and saying yes, he had that, in terms of analyzing why I'm deviating downward, no he did not. And in terms of other decisions in this case, for instance, attorney fee issues, issues of CDs, issues of use of other marital assets, there was never a mention made of the fact that he had this $240,000 account. He took that into account in dividing up the assets, didn't he? The trial court? No. The trial court, the assets, marital assets were divided 50-50. I would suggest to the court that the marital assets weren't divided 50-50. I would suggest to the court that Mr. Berberette received more than 50% of marital assets. And the court did not, in allocating things out 50%, he did not say there was no weight given to the fact that there was this large brokerage account. And so I believe that in light of the expenses of these children, the burdens that my client has financially of these children, of maintaining a house. And by the way, this is a house that she had little choice but to say, I need this house because she had three children that she had to support. She doesn't have any choice but to pay real estate taxes on the house and so forth. And during this two-year period of time, parties were separated, there was no evidence that he lived his life in any kind of way suggestive of not having adequate funds to entertain his children, which is one of the things that the judge talked about, to entertain his children and to be able to participate in school activities. Absolutely no suggestion that that didn't happen during the interim period. There was testimony about vacations he took. There was testimony about trips with the children, about going to sporting events with the children, about a $5,000 boat motor that he purchased, about large amounts of money being spent on duck hunting, about purchasing ammunition, about loaning a friend $900 a month. There was no suggestion that his lifestyle was suffering during this interim time. So if the case law is to be followed, that there has to be compelling reasons to deviate from what the legislature said, statutory child support should be for three children, I don't believe there has been. I don't believe that there's any way of analyzing the facts of this case and coming up with compelling reasons justifying a deviation downward. I've got a note here. The court found that if the guideline amount was awarded, Rebecca's net monthly income would exceed David's by nearly $4,000. The difference between $7,035 per month and $3,046 per month. Is that accurate? That is his calculation. I don't think he'd be too far. I don't disagree with that. I'm not going to disagree. I may disagree with that a little bit, but I don't agree with it largely. That didn't address the $240,000 non-marital account that he had. But with respect to, yes, and my client is supporting a household of four, and he is supporting a household of one. And this is not a case where we have a shared custodial arrangement. He averaged about four nights a month with these children. And we have a 16-year-old boy, a 12-year-old boy, all of whom play substantial sports. They're like three sports a year's kids. I don't think that's a compelling reason to justify a deviation downward. Again, all we're asking for is an application of that which the legislature said was appropriate here. And then a deviation downward of 30% as opposed to, you know, we're not talking about 5% or what the trial court, the judge on the temporary relief order said, I'm just setting child support based on his base income and not on these additional amounts of income. We didn't have anything like that happening here. So your complaint is about $400 a month? $433 a month. And, of course, he does pay the health insurance for the kids? Yes, but that's backed out in calculating support. That was fully backed out, as was his mandatory deduction for his pension. That was fully backed out before child support was calculated. So there was no calculation. Child support was not calculated based on those things. They were backed out in the calculation. So we're asking that the court, that this court reverse the court's decision with respect to the deviation downward by 30% in the establishment of child support. The court then awarded the tax exemptions equally. It said each party had one child, and then this third child was alternated from year to year. This, despite the fact that the child support was reduced by $433 a month, and case law indicating that there should be some equitable considerations on that. And the trial court indicated she was basically supporting these children. And I would suggest to this court it was also an abuse of discretion to have the tax exemptions equally allocated in light of the deviation downward in the establishment of child support. There were some other factors here in terms of division of property. One of them had to do with a purchase six months before trial of a vehicle by Mr. That vehicle ended up getting valued at trial at $33,000. There had been an accident. The parties had insurance. There was $24,000 from proceeds of insurance that were invested in this vehicle, along with some kind of a tax incentive, a $1,200 tax incentive, and the party's credit card points. As it turned out, under the court's allocation, there was $18,000 attributed to this vehicle in terms of equity to Mr. Berberat. My client, on the other hand, who had purchased a vehicle shortly before trial, the amount used for her vehicle purchase was virtually identical to what it was valued at. I have cited case law, the Hubs case, suggestive if you on your own go and purchase something while a marriage is breaking down, that value should be attributed to the vehicle. In this case, it was not. Furthermore, in this case, there was also a worker's comp settlement. Both parties got an injury award. My client, because she had a significant eye injury, and she received, I think it was about $26,000, I'm close on that, that she deposited in a bank account, believing that that was the right thing to do, that the money should be deposited and that the court should address it. Mr. Berberat received a comp award relating to his employment with the city of Springfield that netted out to be about $38,000 after attorney's fees. All but $14,000 of that money was spent during the separation of the parties. I believe that that constituted a dissipation and that there should be some balancing of that in equally dividing the marital estate, which the court said was its intention. With respect to this money, the money that came from the worker's comp settlement, the court addressed certain cash withdrawals that Mr. Berberat had made from this money. Relatively modest, I'm going to call it maybe $1,300 in cash withdrawals. It didn't address any of the other money that was drawn from this account. That which Mr. Berberat said he did with this money was, I paid attorney's fees, I went on vacation, I paid my duck hunting fees. There were reasons like that given. But when we go and allocate out the assets, the assets for, the court simply put what was remaining of his settlement amount and then what was remaining of my client's settlement amount. That was further, I believe, the whole situation made unfair by the fact that my client had paid $6,000 in attorney's fees. She owed $11,000. Mr. Berberat had paid all his attorney's fees from a variety of different sources, from certain certificates of deposits that I haven't addressed, from certain monies relating to his comp settlement, and from other monies. Leaving my client with $11,000 in fees, that was not addressed in terms of the equal allocation of property that the court said it was attempting to do. The court said it was attempting to equally divide property.  including this vehicle, including attorney's fees, including the manner in which certificates of deposit, which were utilized, that this came nowhere close to an equal distribution of marital assets. And that combined with a deviation downward in child support put my client, I believe, in a position where she was not fairly treated by the trial court and that there was an abuse of discretion in this case. In terms of attorney's fees, there was a motion for contributions filed pursuant to 503 and 508. In addition, in the pre-trial memos and in the closing arguments, I also asked that the attorney fee issue be addressed. There was also a claim that Mr. Berberette had. He indicated that he had spoken with a personal injury lawyer, that he very well may be speaking with this personal injury lawyer again because he had been injured during this car accident that resulted in the $24,000 check that went to a replacement vehicle. I asked the court in the closing arguments to reserve jurisdiction on that and the court simply did not address that issue. So I believe that is also something that should have been reserved. Also, we had an issue with respect to retirement accounts. Mr. Berberette's retirement account was valued at the end of 2010. This case was tried in 2011. The court reserved jurisdiction and said, Mrs. Berberette's retirement account is not vested yet. It's not going to be vested until spring. I'm reserving jurisdiction for that to vest so that we can attribute 100% of the value of that. I see that my time is up. With respect to the retirement account, I'm going to value that after it becomes 100% vested in March. His was valued in December. There was a contribution made after the trial also, and then my client's position terminated. She went to someplace else because SOGA closed. As a result, I believe that her pension was valued in April or May. His, the previous December, and I believe that that was not fair, that there should have been valuation dates the same date. We have an opportunity to address this again, and on that last point, when you do, I'd like you to point out what the difference is between these two because it doesn't, normally I would think a few months wouldn't make that much difference. I'd like you to address it. I'll do that. Thank you very much. Okay. Ms. Jarrett. Thank you. First of all, I'll address that retirement account issue first since it's freshly in my mind. What the evidence was was this. As of the end of 2010, our trial occurring in January, there would be a profit sharing, this is the profit sharing plan from her employer. And by the way, she wasn't changing her employer. Her employer had been brought out by Springfield Clinic. She was going to continue working for Springfield Clinic. But because of that buyout, they were closing that plan, and she was about to become 100% vested. The amount, the value of her account as of the end of December 2010 was not yet known because the plan did not issue the statement showing that until March, but there was a value to it. Their contribution was not yet published, but they were going to be making a contribution for her 2010 employment. So all that was going to occur in March was basically a statement telling what the value of her account was as of December of 2010. Judge Nardulli did not reserve jurisdiction. He just said, we'll get that number, and we will apportion it between the parties equally, or make the adjustment. In fact, by the time he issued his memorandum of opinion, that number was known. By the time the judgment was entered, that number was known. There was no reservation of jurisdiction. And there wasn't any inclusion of benefit accrued by her in 2011 either. Just as for Mr. Burberry, it was his accrual as of the end of 2010, it was her accrual as of the end of 2010. We just didn't know that number until March. What about Ms. Ryan's argument pertaining to the potential litigation over the accident that your client apparently was contemplating bringing? Well, whether he was contemplating or not, what he testified to was that he hadn't made that decision. He had talked to a lawyer but hadn't made a decision. What the evidence was is he had a car accident, and he had some soreness and such that was left as a result of it. There wasn't any evidence that there was any particular value to the claim. The claim was not yet filed, as distinct from the cases that are cited in the brief of the affidavit. Well, I have no idea what the possible recovery might be, but let's just assume, put some figure on it, he sues and is able to recover $50,000 for pain and suffering. Is it your position that if that were to happen, that none of this should be considered as far as the dissolution of marriage and disposition of property? Well, I guess under the judgment in terms of property division, if the judgment is affirmed, it wouldn't be. However, it would still be income, and it would still be there for purposes of child support. So I wouldn't say that it wouldn't be considered at all. So a judgment of this kind, an award for personal injury damages, normally, how is that treated in dissolution cases? Normally... Is that income? Is that marital property? Well, I mean, there's the cases, they cite one of the cases. There are certainly cases that, certainly where a case has been filed and is pending, it's marital property. But then how it's divided up depends on a number of factors. But in this particular case, the difference in this case is that there really isn't any evidence in this trial to cause Judge Narduli to think that this was an asset of any significance that should be allocated. Well, what about a situation, though, and this is our third divorce of the day, and certainly there's lots of bitterness out there, it seems like, and it wouldn't be shocking in a different situation for someone who has a potential significant recovery to avoid bringing a lawsuit so that the disposition of property and dissolution of marriage all be done with, and then not going to sue and get X numbers of ballots. Isn't that always a danger if we say this is an appropriate way to handle it? Well, I guess the question is whether the record in this case, whether the evidence in front of Judge Narduli was sufficient that this court feels that that triggers an automatically reserved jurisdiction. As I said, the evidence here... Well, didn't Ms. Ryan just ask to reserve the matter, and what's the matter with that? Well, I mean, you know, if someone stubs their toe, do you reserve the possible lawsuit? I guess the question is how much does there need to be in a record for there to be the reservation of jurisdiction? If it's just maybe there might be some possibility if that's enough, then perhaps this evidence is sufficient. What does the record show, what was presented to Judge Narduli, about what the possible recovery would be if he pursued it? There wasn't anything about possible recovery. The only evidence was he had a car accident, insurance had paid for the replacement of his vehicle, and he had some... I know he testified to soreness. I can't remember specifically, but he just said, you know, I have some soreness, my back hurts, or something like that. I can't remember the specifics. Was that connected to the other workers' compensation stuff he had? No. No, it was not. It was a different time frame, different event. What did the trial court mean when it said in its order that Rebecca will receive a disproportionately large share of the after-tax estate? And he has some figures down below that, and I don't follow that at all. Well, because the way the marital estate was divided up, Mrs. Burberry received the marital residence, which is after-tax, which is distinguished from retirement accounts. Most of what Mr. Burberry received was retirement accounts, so those are all pre-tax dollars. So most of what Rebecca received were post-tax dollars, and Judge Nardulli was making the point, and this related only to where he had calculated a $28,000 equalization payment, that the equalization payment could be made from retirement funds as opposed to post-tax dollars, because most of what Mr. Burberry was receiving was pre-tax dollars, so to enjoy it he has to pay income tax on it, whereas what Mrs. Burberry is receiving, she doesn't have to pay income tax to enjoy it. Did the trial court divide the assets equally between the parties? He did, yeah. The only way it was unequal was because more pre-tax dollars went to Mr. Burberry as opposed to Mrs. Burberry, but the statement made earlier that he didn't divide it equally, I don't think is supported by the record in terms of what the marital estate was. Well, what about the non-marital estate? Did he get a big chunk of non-marital estate beyond? He had one account, which was inheritance from his grandfather, and he received that. I do not believe that what counsel indicated about the judge totally disregarding it in his memorandum opinion is correct. As she did acknowledge, he included the income from that non-marital account in calculating child support. He also specifically, if you look at the memorandum opinion, specifically says that Mr. Burberry receives his Edward Jones account. That was the account. That was the non-marital account. I think that Judge Narduli was completely aware of that. Was that $240,000? Its value at the time of trial was $240,000, yes. When a court is dividing marital property, shouldn't it take into account non-marital property that's awarded to a spouse? It should consider it, and I don't think there's anything here to indicate the judge didn't consider it. But that doesn't mean that there's an unequal division of the marital estate because of it. But you can see, if you add in the non-marital estate, he got a big chunk that she did not get. Well, yeah, and when she inherits money in the future, he won't get that either. But if the court is... The fact that there's some non-marital asset is a consideration for the trial judge in dividing the marital estate. But it is not something that's divided. And if there's an argument now that this was an unfair division of the marital estate because she didn't receive more of the marital estate, that's not an issue that was raised on this appeal. The issue of child support, if I may briefly address some of those issues and questions. Actually, before I get to that, I want to run through a couple of other things. With this Tahoe, this issue of the value of the Tahoe, and again, he had a car accident. There was a replacement of his vehicle. The replacement was this Tahoe. It was not $43,000 that he paid for it. He paid $37,000 for it. All that happened at trial was the current value of that vehicle, as of the date of trial, was used in valuing it for purposes of dividing the marital estate. Just as the van that Mrs. Burberry had purchased in September of 2010 for $31,000, its value as of the date of trial was used. It had depreciated less. That's great. She had it for less time. She may have gotten a better buy than he did, but in no way was it error for the judge to use the present value of these vehicles. His buying of a Tahoe, a vehicle to replace his prior vehicle, can't be considered a dissipation. It's not like the Hubs case, which the appellant cites, where the husband went out and bought a boat that he used for his girlfriend and the court in that case basically found that that purchase was a dissipation. That's why the appellate court in that case said it was correct to use the purchase price because basically this judge treated that purchase as a dissipation. Mr. Burberry's purchase of a Tahoe isn't a dissipation. He needed a vehicle. With regard to the workers' compensation settlement, not only was there testimony, there were exhibits before the trial court of the money from that workers' compensation settlement going into Mr. Burberry's account, and all of the checks when he transferred it over his checking account, the expenditures that were made from it. There was no complaint by the appellant about any of those expenditures that he made except for there's this issue of cash, and I'll get to that in a moment, and then there's complaint that he used some money to pay attorney's fees. And there's an argument in appellant's brief that paying attorney's fees is dissipation. And I've addressed this in my brief also, but under 501C at this point in time, I understand that there are cases where appellate court said paying your attorney was a dissipation, but after 501C, the level of the playing field, which basically contemplates that people are going to pay their attorney's fees if they go along, if they can afford to, and if they can't afford to, they get the other person to pay it. I don't think that you can call that dissipation anymore, to be paying your attorney's fees the way that you're supposed to. Of the other expenditures that Mr. Burberry had from his workers' comp settlement, there were some cash withdrawals. If you look at my brief, I have a page where I go through what his net paychecks were. And by paychecks, I'm talking about from his full-time job plus overtime with the police department. His second job, working security for a housing project. All of those funds didn't total what his living expenses were. He needed to draw cash from somewhere else, and he drew cash from somewhere else. He drew it from the workers' comp. Some of the time, he pulled it from his non-marital account, because while he had the shortfall for his own living expenses, he was still paying $1,200 a month for child support under the temporary order. So, Judge Narduli clearly considered all this, considered what Mr. Burberry was spending money on, considered what Mrs. Burberry was spending money on, and found that what Mr. Burberry did was not a dissipation. And I submit that that was well within the manifest way to the evidence. What's your best case with similar facts that say that the support should be reduced? Well, I cite the Meneer case, in which there was no support ordered. There are some other cases where there's a reduction in support because of the income of the parties. But I think this was mentioned by one of your honors. After the child support award that Judge Narduli gave, Mr. Burberry has $6,612 a month, which is over 65% of their total income, and Mr. Burberry has $3,479 a month, which is a little over 34% of their total income. She has $3,133 more than he does a month to meet the expenses for the children. Judge Narduli gave great consideration to this. I think it's clear from his memorandum opinion, and it was not an abuse of discretion. I don't think this court can say that no reasonable person could have taken the same position as Judge Narduli did. While counsel talked about Mr. Burberry only having the children four nights a month or something like that, there was testimony at trial about, first of all, the evidence of what his solicitation schedule was going to be before the court. Secondly, there was testimony on his part about efforts he had to do his visitation with the children, which were, if not interfered with, were deterred a bit. And Judge Narduli also testified about going to the games with the children, activities he does with the children. Mr. Burberry is entitled to maintain something of a reasonable lifestyle, as well as Mrs. Burberry, and we would submit that the deviation that Judge Narduli did was explained and is justified and is not an abuse of discretion. There is a statement, by the way, in the reply brief. There's a couple of things in the reply brief, which, since I don't get to do a reply to reply, I just want to address them briefly. There's a statement that David increased his wealth from the time of a temporary hearing exhibit, which is in the record on appeal, but it wasn't an exhibit that was introduced at trial in front of Judge Narduli. It wasn't part of the evidence in front of him. And I do not believe it's proper to start referring to something that wasn't in evidence in front of him in trying to suggest that in some way he abuses discretion. But even if you consider that exhibit, there was not an increase in wealth on the part of Mr. Burberry, except for that non-marital account. As the Court may recall, there's been a lot of fluctuation in market values over the last few years. It increased in value. And the other thing was that he received his workers' compensation money, and so there was an increase as a result of him receiving his workers' compensation money. But in terms of him being able to save money or in some way add to his wealth under the temporary order, as the refinery seems to suggest, that is not the case. Also, the judge had before it what, when we talk about Mrs. Burberry's expenses, and by the way, if there was a statement earlier by counsel that Mrs. Burberry's income after she receives the child support will not be sufficient to meet her expenses, I don't believe that's correct. Because after the child support, she has, as I said, $6,612 a month of net income. But also, the judge could consider the expenses that she's listing, and to some extent take that into account. I mean, she was listing $190 a month for a cell phone, $150 a month for hook clothing, $120 a month for grooming, $200 a month for household maintenance, $250 a month for eating out. All of this is part of the job of the trial court, as I'm sure this court is aware, to weigh and to assess credibility and to consider all that in arriving at the amount of child support. So again, I don't believe the court abuses discretion on that. Thank you. Unless the court has any further questions, we did a responsive brief, and I think most matters are addressed in that brief as well. No? I see none. Thank you, counsel. Ms. Ryan? I'd like to address, if I may, something Justice McCullough brought up briefly, and that had to do with these tax statements that the trial court made in its motion on reconsideration. Mr. Berberet filed a motion to reconsider late the 30th day, and in that he said that the money that my client was to receive as an equalization payment should be paid to her by way of retirement monies rather than by way of cash. The initial order had it paid to her in cash, and quite frankly, they made this situation, we thought, a bit more fair to our client, because she would have $28,000 in cash from which she could tap on to pay expenses for children, expenses of her house, things of that sort. They filed a motion saying it shouldn't be cash, it should be retirement money, and the court granted their motion and said, yes, it can be a $28,000 transfer of retirement money, and the reasons that the court gave for changing its decision were that someday they were each, and its assumption was, going to have to pay 28% taxes on this money. I believe that that was a speculative decision in terms of what taxes would have to be paid. I also think it disregarded the fact that there are retirement monies that would be building tax-deferred over a course of many years before they were received. Retirement monies are a good thing, but in light of the fact that my client was going from $1,290 a month in child support to $1,000 a month in child support, and no, her expenses weren't covered by what she was getting in child support, that that was important to have that money. Again, this is a gentleman who has $241,000 in non-marital assets. My client didn't have anything, nothing in terms of cash to turn to, to make sure that the house expenses were met and so on and so forth. So I believe that the court's decision to change its decision to have her a $28,000 equalization payment and instead make that from retirement monies was an abuse of discretion. And there is case law, Davis, and it was citing the M case, and it's saying that only those tax consequences that are immediately flowing from the property distribution should be considered. And the court based its whole decision to change its original order based on these ultimate tax ramifications. And the court said, well, I'm supposed to consider tax ramifications in my allocation of property. My response to that is, well, that's immediate tax considerations, not those that are going to occur way down the road someday. And also, one has to consider what the immediate needs of a parent are. And my client had immediate needs. When we ended my arguments, we were talking about retirement money. And ultimately, my client, ultimately, Mr. Berberet got 50% of every single dime ever put in my client's profit-sharing account from SOGA. And she got a percentage of his, right? She got a percentage of his through the end of the year before, through 2010. He alone puts in $500 a month into his retirement account. That's not the government's contribution. That's his contribution to his pension is $500 a month. So hers basically got valued in May when her job ended, and his in December. And I suggest... She retained her job and ended, but she's still employed, right? Her job at SOGA ended, and she went to Springfield. No, she's unemployed right now. But at that time, she went from SOGA to Springfield Clinic, and they had very different retirements. So, I mean, it wasn't like there was an additional sum paid her for her work from January to April. That didn't happen. He got 50% of every single thing that she had. The same was not true with respect to her interest in his pension, which is a defined benefit. Do you agree there was an equal division of marital assets? No. I don't believe there was an equal division of marital assets. I think that that court said that it equally divided. That court tried to make an equal division. It tried, sure. I mean, sure, I think it tried, but I think it failed. And there were some certificates of deposit that were funded with monies that were put into a joint account. Then CDs were funded. Periods of time in the past, after that, same account number that Mr. Berberette, during the course of proceedings, withdrew the monies from and used. Things like vacations, things like attorney's fees, things like hunting trips, those sorts of things. The court said those CDs were non-marital. I believe they were marital. And even if they were non-marital, those were monies that were available to Mr. Berberette to enjoy his lifestyle, which I believe was absolutely as good or better than the lifestyles of my client and the children, and that that should have been something that the court considered. Does he do a lot of things with the children? Well, the records that my client kept, which were meticulous, were that he spent four nights a month with the children. I think he loved his kids. There's no question about that. I think he went to their sporting events and things of that sort. But the record in this case was replete with my, he testified that he hunted 30 to 40 days a year. The record was replete with my client using all of her vacation time and everything else to take these kids to their sporting events, driving them up and down the road, doing their school activities, being one of the moms who made the spaghetti dinner. She was the mom who was very much the primary caregiver in this case, which creates, I believe, a scenario in terms of the monies that are being made available to her to continue to do that. That's why I'm here today. Thank you. Thank you, Counselor. I want to add as we recess, I thought you both did a very nice job in your presentations to this court today. Thank you for your presentations. Thank you, sir.